**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ALISSA LESLIE LITTLE,      :     CIVIL NO.: 1:21-cv-00492
                   :
       Plaintiff,     :     (Magistrate Judge Schwab)
    v.            :
                   :
KILOLO KIJAKAZI,[1]     :
Acting Commissioner of     :
Social Security,      :
                   :
      Defendant.    :

## MEMORANDUM OPINION

### I. Introduction.

In this social security action, Plaintiff Alissa Leslie Little seeks judicial

review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claim for disability insurance benefits under Title II

of the Social Security Act.  We have jurisdiction under 42 U.S.C. § 405(g).  For the

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, and she is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

reasons set forth below, we will affirm the Commissioner's decision and enter judgment in favor of the Commissioner.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 10-1 to 10-13.*[2]  On November 28, 2018, Little protectively filed[3] an application for disability insurance benefits, alleging that she has been disabled since July 24, 2018. *Admin. Tr.* at 180–81.  After the Commissioner denied her claim at the initial level of administrative review, Little requested an administrative hearing. *Id.* at 127–28.  And on May 6, 2020, Little, represented by counsel, testified at a hearing before Administrative Law Judge ("ALJ") Richard Guida. *Id.* at 31–60.[4]

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Little's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id*.  Here, Little's application for benefits is dated December 21, 2018. *See Admin. Tr.* at 180.  But there are references in the record to the filing date as November 28, 2018. *See id*. at 61, 65, 77, 79, 95, 97.  And November 28, 2018, is the date identified by the ALJ as the date that Little protectively filed her application. *Id*. at 12.

[4] The hearing was "conducted by telephone due to the Corona Virus [sic] situation." *Admin. Tr.* at 33.  Little agreed to a telephone hearing. *See id*. at 175 (notation that Little's counsel agreed to a phone hearing).  At one point in her brief, Little states that she was unable to appear before the ALJ. *See doc. 17* at 8.  As set

The ALJ determined that Little had not been disabled from July 24, 2018 (the alleged onset date), through May 21, 2020 (the date of the decision). *Id*. at 24–25. And so, he denied Little benefits. *Id*. Little appealed the ALJ's decision to the Appeals Council, which denied her request for review on January 26, 2021. *Id*. at 1–5. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In March 2021, Little, through counsel, began this action by filing a complaint claiming that the Commissioner's decision is not supported by substantial evidence. *Doc. 1* (*passim*). She requests that the court reverse the Commissioner's decision and award her benefits. *Id*. at 8 (Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 6*. The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 9, 10*. The parties filed briefs, *see docs.* 17, 18, and this matter is ripe for decision.

---

forth above, this is false: Little testified before the ALJ albeit by phone. *See Admin. Tr.* at 35–56 (Little's testimony). And at another point in her brief, Little asserts that she "would have testified to" limitations in addition to those set forth by the ALJ if "given the opportunity to do so." *Doc. 17* at 9. Again, Little had the opportunity to testify, and her attorney questioned her about her impairments and limitations without restriction by the ALJ. *See Admin. Tr.* at 35–56 (Little's testimony).

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154.  Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding

from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Little is disabled, but whether substantial evidence supports the Commissioner's finding that she is not disabled and whether the Commissioner correctly applied the relevant law.

### B.  Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).  Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became

disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[5]

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)

---

[5] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)).  "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Little met the insured-status requirements through December 31, 2022. *Admin. Tr.* at 14.

(quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999). The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, "'the

reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On May 21, 2020, the ALJ denied Little's claim for benefits. *Admin. Tr.* at 9–29.  He proceeded through the five-step sequential-evaluation process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Little had not engaged in substantial gainful activity since the alleged onset date. *Id.* at 14.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Little had the following severe impairments: Degenerative Disc Disease, Bipolar Disorder, and Generalized Anxiety Disorder. *Id.* at 14–15.  He also found that although Little claimed disability secondary to right wrist and hand pain, her right wrist impairment was not severe. *Id.* at 15.  The ALJ noted that Little indicated that her "hand swells and hurts after repeated use" and "[s]he reports tingling in the right thumb, through the wrist, and into the shoulder." *Id.* (citations to the record

omitted).[6]  And he observed that a 2016 radiographic study of the right wrist found

"early/mild radiocarpal osteoarthritis," and a "2019 study found De Quervain's

tenosynovitis and arthritis of the right thumb." *Id*.  The ALJ concluded, however,

that the "findings during the relevant period show no more than minimal

limitations involving the right wrist":

> Examinations of the right wrist and hand show normal ranges
> of motion.  Hand and finger dexterity are intact.  She
> demonstrates an ability to zip, button, and tie without difficulty.
> She had full grip strength.  She also uses a computer, performs
> chores around the home, and does yard work.  She treats
> conservatively with pain medication and a wrist brace.  She
> noted some pain and mild swelling at a March 2020
> examination, which she noted was due to overuse.

*Id*.  Given that there was "no more than minimal limitations in work-related

functioning," the ALJ found that "the right wrist is non-severe for disability

purposes." *Id*.  And he concluded that his "limitation to light work" in his RFC

"accommodates any limitation with no further limitation in manipulation required

based on the ability to perform a full range of gross and fine motor movements

with the right upper extremity." *Id*.

---

[6] To improve readability, here, and elsewhere, when quoting the ALJ's
decision we omit citations to the record.

### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that Little did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. Specifically, that ALJ considered Listing 1.04 with respect to Little's lumbar degenerative disc disease. *Id*.

And considering Listings 12.04 and 12.06 with respect to Little's mental impairments, the ALJ concluded that Little did not meet the paragraph B criteria for those listings. *Id*. at 15–17.  He found that Little had a moderate limitation in her ability to understand, remember, and apply information. *Id*. at 16.  In this regard, the ALJ reasoned that although Little reported "memory issues and problems following instructions," she is able "to perform simple and routine household chores," she cares for herself and the family dog, she attends appointments, drives, handles money, and shops. *Id*.  He also observed that Little "takes an active role in her medical treatment," her "medical providers find [her] cooperative and able to follow along during examinations," and "examinations find her memory intact." *Id*.  Finally, the ALJ noted that "[t]he State agency psychologist[s'] opinion[s] support this finding." *Id*.

The ALJ found that Little had a mild limitation in her ability to interact with others. *Id*.  In this regard, he reasoned that although Little reported "suffering from

social anxiety and panic attacks as well as paranoia when in public, she generally gets along with others." *Id*.  And she can travel outside alone, shop, and attend appointments. *Id*.  The ALJ also noted that her "medical providers find [her] cooperative with appropriate social behavior and interaction." *Id*.  Finally, the ALJ noted that "[t]he State agency psychologists' opinions support this finding." *Id*.

The ALJ found that Little had a moderate limitation with respect to concentrating, persisting, and managing pace. *Id*.  In this regard, he reasoned that although Little reported "difficulty focusing, following instructions, and completing tasks" and requiring "encouragement to do thing around the home," she does "light household chores, including laundry." *Id*.  And she provides for her personal care and the care of her dog. *Id*.  The ALJ also noted that her "medical providers find [that she] is able to focus and follow along during examinations" and that "her concentration is intact." *Id*.  Finally, the ALJ noted that "[t]he State agency psychologists' opinions support this finding." *Id*.

The ALJ found that Little had a mild limitation in her ability with respect to adapting or managing oneself. *Id*.  In this regard, he reasoned that although Little reported "lacking motivation to take care of personal hygiene, that is, dressing and bathing, and to prepare food on a daily basis, she also notes being able to do these tasks when necessary," and she helps with household chores, shops, drives, and handles money. *Id*.  He also observed that Little "takes an active role in her

treatment" and her "medical providers do not indicate that she has problems with handling changes to her care." *Id*.  Finally, the ALJ noted that "[t]he State agency psychologists['] opinions[] support this finding." *Id*.

In addressing the mental listings, the ALJ also concluded that Little did not meet the paragraph C criteria and that "no State agency psychological consultant concluded that a mental listing is met." *Id*. at 17.

## D.  The RFC.

The ALJ then determined that  Little has the RFC to perform light work[7] with some limitations. *Id*. at 17.  He outlined limitations on Little using ramps, stairs, ladders, ropes, and scaffolds; on her balancing, kneeling, crouching, stooping, and crawling; and on her being exposed to extreme cold, dangerous machinery, and unprotected heights. *Id*.  He also determined that Little "is limited to work that is simple and routine tasks involving only simple, work-related

---

[7] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

decisions and with few, if any, workplace changes." *Id*. And, he determined, she

"cannot tolerate production-pace work." *Id*.

In making this RFC assessment, the ALJ reviewed Little's assertions and

testimony:

> [Little] alleges disability secondary to mixed physical and
> mental health disorders that cause back pain that radiates to the
> legs, decreased range of motion, weakness, poor concentration,
> loss of focus, mood changes, social anxiousness, irritability,
> tearfulness, paranoia, and impulsiveness. She describes the
> lower back pain as moderate constant pain to severe sharp and
> shooting pain. Medications cause daytime fatigue. The
> symptoms and medication side effects allegedly affect lifting,
> squatting, bending, standing, reaching, walking, sitting,
> kneeling, climbing stairs, memory, completing tasks,
> concentration, understanding, following instructions, using
> hands, and getting along with others. [Little] reports
> considerable limitations in daily functioning. She reports that
> she can walk one block before needing to rest for a few
> minutes. She indicates that sitting aggravates her lower back
> pain. She reports that she lays down due to back and leg pain
> and naps in the morning, afternoon, and evening. [Little]
> alleges mood swings from depressed mood to impulsive
> behavior. She indicates having problems focusing for more
> than ten to fifteen minutes. She alleges that she does not follow
> instructions well. [Little] reports becoming anxious in public
> and keeping her distance from others. She stays mostly at
> home. She does not like to drive in unfamiliar places or more
> than short distances due to anxiety. She notes getting lost when
> driving five minutes from her home. She alleged that she
> stopped working due to back and leg pain and depression and
> anxiety attacks at work. She describes the panic attacks as heart
> racing and shaking.

*Id*. at 18. The ALJ also considered the report of Little's mother, who reported that

Little suffers "similar physical and mental health problems" as Little had reported.

13

*Id.*  He also noted that Little's mother stated that Little "was so depressed at one point, she did not leave her sofa," and that she "has little interest in personal care at times, and at other times, she exhibits impulsive spending habits." *Id.*

The ALJ also considered the medical evidence concerning Little's physical impairments. *Id.*  He noted that Little "has a history of lumbar degenerative disc disease with prior laminectomy at L4-5 in 2012." *Id.*  "This surgery improved and stabilized her lower back symptoms and permitted her to work." *Id.*  But the ALJ acknowledged that "[i]n 2018, she reported lower back pain that radiated down the leg," "[s]he treated the pain with tramadol and ibuprofen," and "[p]hysical therapy did not improve the pain." *Id.*  He also mentioned that "[e]xaminations showed some pain to palpation of the lower back," that a "December 2018 MRI of the lumbar spine found degenerative disc disease from L2-3 to L4-5," and that in 2019, it was recommended that she get "an epidural steroid injection for mild protrusion of the disc at L4 on L5 as well as continue with tramadol, Advil, and Tylenol and home exercises." *Id.*

The ALJ also relied on a June 2019 report from Karena Hammon, NP, who performed an independent medical consultative examination of Little. *Id.* at 18–19.  He detailed Hammon's observations and conclusions regarding Little:

> Ms. Hammon observed [Little] with normal gait.  She walked on heels and toes without difficulty.  She squatted sixty percent, which hurt her back.  Her stance was normal.  She did not require or use an assistive device to move about, and she did

> not need help getting on or off the examination table.  She
> transferred from sitting to standing without difficulty.  Straight
> leg raise was negative sitting and supine.  Her joints were stable
> and non-tender.  Ms. Hammon did not find any sensory or
> strength deficits in the extremities.  Fine motor skills were
> intact with an ability to zip, button, and tie without difficulty.
> She had normal ranges of motion throughout the body except
> for some decrease in lumbar flexion-extension.

*Id*. at 19.  The ALJ further recounted that during a February 2020 annual

examination with Physician Assistant Marlene Claman,[8] who was Little's "primary

care provider," Little "denied arthralgia, joint swelling, or muscle weakness," and

Claman "found normal range of motion throughout the body." *Id*.

Noting that Little "received routine care, which included physical therapy

and pain medication," the ALJ reasoned that the medical records rendered Little's

"allegations of debilitating back pain and resulting functional limitations less

persuasive." *Id*. at 19.

The ALJ also considered the medical evidence concerning Little's mental

impairments:

> [Little] has a history of mental health treatment for major
> depressive disorder and anxiety. She attended an adult day
> program in 2016 for medication management and inpatient
> hospitalization in 2017 due to suicidal ideation.  She continued

---

[8] At this point in his opinion, the ALJ refers to this person as Little's "primary care provider." *Admin. Tr.* at 19.  But from the records that he cites, it is clear that this person is Marlene Ann Claman, PA-C. *See id*. at 893–96.  Elsewhere in his opinion, the ALJ spells this person's last name "Clayman," *see id*. at 21, as does Little in her brief, *see doc. 17* at 2, 20, 23–24.  We will, however, use the spelling in the medical records.

with mental health treatment since the alleged onset date. The psychiatrist followed [Little] monthly for medication management checks, and [Little] attended weekly therapy sessions. In August 2018, she began weekly therapy sessions for depression, bipolar disorder, and anxiety. The anxiety was mainly associated with work. The therapist provided coping skills. Subsequent therapy session generally found [Little] achieving moderate progress and good benefit from therapy. She was oriented to person, place, and time. She denied serious symptoms of suicidal or homicidal ideation. The therapist continued to work with [Little] [during] periods of regression due to increased anxiety symptoms. The psychiatric medication management treatment notes showed no more than moderate level of abnormalities. [Little] was cooperative and alert with adequate eye cont[]act. Decision-making ability was intact. Memory and concentration were normal with an ability to recall objects and to complete serial 7s. The psychiatrist prescribed Klonopin as needed for anxiety, Trazodone for sleep, and Buspar, Effexor, and Lamictal for mood. She continued to deny serious symptoms [of] suicidal or homicidal ideation. In July 2019, [Little] reported pervasive depressive thoughts throughout the day, appetite changes, sleep disturbance, lack of motivation, poor self-care, and changes in energy. The mental status examination found her tearful and depressed. Insight and judgment were fair, but she had no impairment regarding thought content, memory, or concentration. She recalled three out of three objects after three minutes and performed serial 7s and spelled "work" backwards. The August 2019 medication management check had similar mental status examination findings. She continued with medications.

*Id*. at 19–20. The ALJ also noted that during a "February 2020 annual examination with the primary care provider, the provider found normal mood and affect, normal behavior, and normal thought content," and that Little "was negative for depression, sleep issues, or anxiousness." *Id*. at 20. "The provider also noted

16

normal mental health functioning at the March 2020 visit to fill out disability paperwork." *Id*.

The ALJ concluded that Little's "medical records do not indicate she was persistently assessed with abnormal clinical examination findings pertaining to her mental health impairments" and that the records found that she coped "generally well with medication and therapy without a need for intensive or extensive mental health care." *Id*. at 20.

The ALJ also considered Little's daily activities, finding that they do not support Little's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms." *Id*.  He noted that Little "provided inconsistent information regarding daily activities in that she has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations." *Id*.  In this regard, he explained that "[w]hile [Little] indicates that she does not perform chores around the home when she is depressed, she provides for personal care on a daily basis, performs light household chores and yard work, prepares meals, and launders clothes." *Id*.  "She and her husband perform these chores as needed." *Id*.  And the ALJ observed that "[w]hile she does not shop in stores regularly, her therapist has her attending church services," and "[s]he visits with her mother," and "is able to eat in restaurants." *Id*.  According to the ALJ, "[t]hese admitted abilities provide support, in part, for the residual

functional capacity set forth above and are quite inconsistent with [Little]'s allegations of totally debilitating impairments involving her back and her mental health." *Id*.

Further, in making the RFC assessment, the ALJ considered the opinion evidence in the record. *Id*. at 20–22.  He found persuasive the opinions of the state agency physicians regarding Little's physical impairments. *Id*. at 20–21.  As recounted by the ALJ, those physicians found that Little was "able to perform light work with lifting and carrying twenty pounds occasionally and ten pounds frequently, standing or walking six hours, and sitting six hours with occasional climbing ladders, ropes, or scaffolds, stooping, or crawling and frequent climbing ramps or stairs, balancing, kneeling, or crouching." *Id*.  They further  found that "she must avoid concentrated exposure to cold and hazards." *Id*.  Noting that these physicians did not examine Little, but that they reviewed medical records submitted at that time of the opinions, the ALJ found these opinions "supported by citation to the medical records and . . . consistent with the observed examination findings and radiographic studies." *Id*. at 21. In this regard, he noted that "[t]he radiographic studies of the lumbar spine found mild degenerative changes, and the examinations from orthopedics, consultative physician, and primary care provider notes normal gait and stance," that Little "has good ranges of motion of the upper and lower extremities," that she has "some tenderness to palpation to the lower

back, and [that] she has some decrease in range of motion in the lower back." *Id*.
The ALJ also noted that the "routine treatment of pain medication also support[s]
the limitations in the opinions," and that Little's "daily activities of being able to
perform household chores and yard work are consistent with the limitations in the
opinions." *Id*.

The ALJ also found persuasive the opinions of the state agency physicians
regarding Little's mental impairments. *Id*. at 21–22.  As recounted by the ALJ,
those physicians found that Little was "able to meet the basic mental demands for
simple routine tasks on a sustained basis with not more than moderate limitations
in functioning." *Id*.  Again, noting that these physicians did not examine Little, but
that they reviewed medical records submitted at that time of the opinions, the ALJ
found these opinions "consistent with the mental health treatment records and . . .
supported by the psychologists' citation to the records." *Id*. at 22.  In this regard,
the ALJ noted that "[t]he treatment records showed stability and improvement in
mental health functioning with medication management and therapy," that "[t]he
providers noted generally intact memory and concentration despite her allegations
of poor memory and concentration," that Little "was cooperative with appropriate
social behavior," and that "[s]he received medication treatment with therapy
with[out] a need for more intensive or extensive care, which is consistent with
these opinions." *Id*. at 22.  He also concluded that Little's "daily activities of being

able to perform household chores and yard work and provide for personal care are consistent with the limitations in the opinions" and these "activities show an ability to perform simple routine tasks and to deal with changes in her home." *Id*.

The ALJ found the opinion of Karen Hammon, NP, partially persuasive. *Id.* at 21. Given Little's back pain and wrist tendonitis and osteoarthritis, the ALJ concluded that Little could lift and carry less weight than Hammon had concluded that she could. *Id.* He otherwise found the opinion of Hammon persuasive, and he explained that he did not add "any right hand limitation due to the examinations showing good functioning with the right hand and no more than minimal limitations." *Id.* He noted that "Ms. Hammon's examination findings show[ed] normal gait, good strength and sensation in the extremities, and good ranges of motion throughout the body with some decrease in the lower back" and that those finding "are consistent with the sitting, standing, and walking abilities, namely [Little] has the ability to sit six hours, stand five hours, and walk four hours in an eight-hour workday as well as the occasional postural activities in Ms. Hammon's opinion." *Id.* He also concluded that "the observed findings from [Little]'s providers, along with the routine treatment for pain, are consistent with Ms. Hammon's opinion." *Id.* And he noted that "Ms. Hammon, as a consultative examiner, is familiar with the Social Security disability procedures, rules, and regulations." *Id.*

The ALJ found the opinion of Physician Assistant Claman not persuasive. *Id*. at 21. Claman opined that Little "can sit for less than two hours and can stand or walk less than two hours in an eight-hour workday along with rarely twisting, stooping, crouching, or climbing stairs." *Id*. The ALJ concluded that Claman's "observations from the examination on the same day as the opinion are inconsistent with the extensive limitations in the opinion." *Id*. He also noted that "at the annual examination in the previous month, [Little] denied arthralgia, joint swelling, or muscle weakness," and Claman "found normal range of motion throughout [Little]'s body." *Id*. The ALJ also observed that "the orthopedic treatment notes and the consultative examination show generally mild findings, such as pain to palpation, some decrease in range of motion, and reduced squatting; however, [Little] maintained normal gait and did not appear in distress due to lower back pain." *Id*. "For these reasons," that ALJ found that Claman's "opinion is not persuasive." *Id*.

The ALJ also found the opinion of Karen Medzoyan, MD, who is Little's "psychiatry provider," not persuasive. *Id*. at 22. Medzoyan opined that Little has "marked and extreme limitations in interacting with others, in concentration, persistence, or pace, and in adapting or managing oneself." *Id*. "Dr. Medzoyan indicated further that [Little]'s impairments would substantially interfere with [her] ability to work on a regular and sustained basis at least fifteen percent of the

workday and [Little] would be absent ten to twelve workdays [per] month due to her impairments or related treatment." *Id*.  But the ALJ concluded that Dr. Medzoyan's treatment notes were "not consistent with these marked and extreme limitations, inability to remain on task, and absenteeism." *Id*.  He also observed that "[t]here is little in the record to support marked sensitivity during social interactions," and that Little's "providers have found [her] cooperative and engaging in appropriate social behavior in the clinical settings." *Id*.  The ALJ further noted that Little "dines out" and "is able to follow along and to take an active role in her management." *Id*.  "Regarding concentration and adapting," he concluded that "the mental status examinations show no more than moderate level abnormalities, such as fair insight and judgment, and normal findings, such as intact concentration and memory." *Id*.  And according to the ALJ, "[t]hese examination findings do not support the marked limitation[s] [found by Dr. Medzoyan] in the ability to work [at] pace, to respond to demands, and to adapt to changes and the extreme limitation to sustain ordinary routine and regular attendance at work, to manage her psychological symptoms, and to work a full day without needing more than normal breaks." *Id*.  The ALJ also observed that Little's "daily activities show an ability to perform simple household chores and tasks on a regular basis, which suggests an ability to handle some change and to adapt as well as to complete some simple, routine tasks." *Id*.

In summary, the ALJ concluded that the medical evidence and the opinions of the state agency physicians and Ms. Hammon do not support the functional limitations Little claims to suffer, but, rather, they support the limitations he set forth in the RFC. *Id*. at 22.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Little was unable to perform her past relevant work as a pharmacy technician or nursing assistant. *Id*. at 23.

### F.  Step Five.

At step five of the sequential-evaluation process, considering Little's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as cashier, ticket taker, and cafeteria attendant—that exist in significant numbers in the national economy that Little could perform. *Id*. at 24.

In sum, the ALJ concluded that Little was not disabled. *Id*. at 24–25.  Thus, he denied Little's claims for benefits. *Id*.

23

## V.  Discussion.

The brief filed by Little is unfocused and touches on many issues. *See doc. 17* (passim).  But Little explicitly sets forth the following three claims: (1) that the ALJ erred and abused his discretion by failing to consider in the RFC limitations from her degenerative disc disease, bi-polar disorder, and generalized anxiety disorder, which he determined to be severe impairments; (2) that the ALJ erred and abused his discretion by failing to consider in the RFC limitations from her panic disorder, sleep disorder, right wrist and forearm arthritis, right foot pain, bilateral knee pain, fatigue, and pelvic pain with bleeding, which he must have determined to be non-severe impairments; and (3) that the ALJ erred and abused his discretion by failing to assign proper weight to the opinions of Dr. Medzoyan and Physician Assistant Claman, her treating providers. *Id.* at 1–2.   As claims one and two both deal with the RFC, we address those claims together.  We then address claim three regarding the opinion evidence.  For the reasons discussed below, we conclude that Little's claims are without merit.

### A. The ALJ did not err by failing to impose additional limitations in the RFC.

As set forth above, Little claims that the ALJ erred and abused his discretion in formulating her RFC by failing to include additional limitations in the RFC.

Before addressing Little's specific arguments, we set forth the standards regarding the RFC assessment in general.

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359 n.1). In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121. "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066). The court's "review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL 4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's] residual functional capacity with the deference required of the substantial evidence standard of review.").

"Surveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). And "[i]n

evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009).

Further, in setting the RFC, the ALJ must clearly articulate his or her reasoning. In other words, the ALJ must "set forth the reasons for his decision" to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119 (citing *Cotter*, 642 F.2d at 704–05). Although an ALJ need not "use particular language or adhere to a particular format in conducting his analysis," the ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ's decision must set out "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704. If an ALJ "has not sufficiently explained" how he or she considered all the evidence "'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Dantzler v. Saul*, No. 3:16-CV-2107, 2019 WL 5569466, at *1 (M.D. Pa. Oct. 28, 2019) (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)).

Applying the above standards to the present record, we conclude that the ALJ's RFC determination is supported by substantial evidence. First, contrary to Little's suggestion otherwise, the ALJ considered the record as a whole. Over the

span of seven pages, the ALJ thoroughly explained his decision to limit Little to light work with some limitations. *Admin. Tr.* at 17–23.  And, as detailed above, in making his RFC assessment, the ALJ reviewed Little's assertions and testimony regarding her impairments and limitations, her mother's report, the medical records, the opinion evidence, and Little's daily activities.  In sum, the ALJ considered the record as a whole.

Little also asserts that the ALJ failed to consider some evidence.  But the ALJ explicitly cites to many of the very  pages that Little cites in this regard.  In other instances, while the ALJ may not have cited to the specific pages cited by Little, he cites other pages of the same exhibit.  There are a few pages that Little cites that the ALJ does not explicitly reference.  But although "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity," *Fargnoli*, 247 F.3d at 41, "[t]here is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  Here, after reviewing the record and the ALJ's decision, we are satisfied that the ALJ sufficiently addressed the medical evidence, and he adequately explained the rationale for his decision.

In a similar vein, Little contends that the ALJ ignored some of her impairments and limitations.  In this regard, she mentions her right wrist and forearm arthritis.  But as set forth above, the ALJ specifically addressed why he

found her wrist impairment was not severe. *See Admin. Tr.* at 15.  In so doing, in addition to addressing her wrist, he addressed her contentions regarding her hand pain, her arthritis, and her shoulder. *Id.*  And he found that given her "right wrist tendonitis and osteoarthritis," she could lift and carry less weight than the consultative examiner concluded that she could lift and carry. *Id.* at 21.  Thus, we reject Little's contention in this regard.

Little also suggests that the ALJ failed to consider her panic disorder.[9]  But again, the ALJ addressed her reports that she suffers from social anxiety, panic attacks, and paranoia while in public, finding, nevertheless, that she had only mild limitations in interacting with others. *Id.* at 16.  And in setting the RFC, he considered her assertions regarding her mental issues, including panic attacks. *Id.* at 18, 22–23.  He also considered her therapy and other records regarding her mental impairments, including her anxiety. *Id.* at 19–20, 22.  And he explained why he found the state agency physician's opinions more persuasive regarding her mental limitations than Dr. Medzoyan's opinion. *Id.* at 21–22.

---

[9] In her disability report, Little listed the following medical conditions: (1) bipolar; (2) depression; (3) anxiety; (4) degenerative disc disease; (5) wrist issues; and (6) back issues. *Admin. Tr.* at 212.  Thus, it is not surprising that the ALJ did not make a specific finding as to whether other impairments were severe or not severe.

Similarly, although Little contends that the ALJ failed to consider limitations from her sleep disorder, fatigue, and the fact that her medications make her sleepy, the ALJ did acknowledge these issues. *See id*. at 18 (noting Little's contention that her medications cause daytime fatigue and her contention that she "naps in the morning, afternoon, and evening"); *id*. at 19 (noting that Little's psychiatrist prescribed Trazodone for sleep and that in July 2019, Little reported, among other things, "sleep disturbance"); *id*. at 20 (noting that during her February 2020 annual exam, Little was negative for sleep issues).  And he explained why he credited the opinions of the state agency physicians and psychologists regarding the severity of Little's limitations over Physician Assistant Claman and Dr. Medzoyan as well as why he considered Little's medical records and daily activities as not consistent with her contentions regarding the severity of her symptoms.

Little also suggests that the ALJ failed to consider her right foot pain, her bilateral knee pain, and her pelvic pain and bleeding.  Although the ALJ did not mention foot or knee pain specifically, he extensively addressed her back pain that radiates into her leg, *see id*. at 18, 19, and he found persuasive the medical opinions that she had a normal gait and stance, no "sensory or strength deficits in the extremities," and normal range of motion except in the lower back, *id*. at 19, 21.  In any event, Little has not credibly shown that either her foot or knee pain imposed any additional functional limitations.  And as to the pelvic pain and

bleeding, the record shows that issue resolved after her hysterectomy. *See id*. at 836 (note from May 3, 2019 follow-up visit noting that Little "has had no pain, no bleeding" and that "all postoperative restriction were lifted"); *id*. at 43 (Little's testimony that since her surgery, she has not had any pelvic pain or cramping).

Little also contends that the ALJ did not explain why he did not find her statements regarding her limitations credible.  But the ALJ did, in fact, explain in detail why he found Little's statements regarding the severity of her limitations not to be credible.

"An ALJ must carefully consider a claimant's statements about [his] symptoms, but the ALJ is not required to credit them." *Sudler v. Comm'r of Soc. Sec.*, 827 F. App'x 241, 245 (3d Cir. 2020) (internal citations and quotation marks omitted).  "The framework for evaluating a claimant's reported symptoms is set forth in 20 C.F.R. § 404.1529 and Social Security Ruling 16-3p." *Falardo-Weller v. Saul*, No. 1:18-CV-1719, 2020 WL 2542222, at *3 (M.D. Pa. May 19, 2020). "When evaluating a claimant's symptoms, the ALJ must follow a two-step process." *Id*.  "The ALJ must first ask whether the claimant has a medically determinable impairment that 'could reasonably be expected to produce [the claimant's] alleged symptoms.'" *Id*. (quoting 20 C.F.R. § 404.1529(b)).  "If there is no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic

work activities." *Wilson v. Kijakazi*, No. 4:20-CV-944, 2022 WL 676279, at *15 (M.D. Pa. Mar. 7, 2022).  But if there is a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, "the ALJ must evaluate the 'intensity and persistence' of those symptoms to determine how, if at all, they limit the claimant's capacity for work." *Falardo-Weller*, 2020 WL 2542222, at *3.

Here, the ALJ found that Little's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms[.]" *Admin. Tr.* at 18. But he concluded that Little's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [his] decision." *Id.*

"In evaluating the intensity and persistence of a claimant's alleged symptoms, the ALJ is required to 'consider all of the available evidence, including . . . medical history, the medical signs and laboratory findings, and statements about how . . . symptoms affect' the claimant." *Falardo-Weller*, 2020 WL 2542222, at *3 (quoting 20 C.F.R. § 404.1529(a)).  "The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory

findings." *Sager v. Kijakazi*, No. 3:21-CV-100, 2022 WL 773917, at *12 (M.D. Pa.

Feb. 11, 2022), *report and recommendation adopted*, 2022 WL 757237, at *1

(M.D. Pa. Mar. 11, 2022).  "Thus, to assist in the evaluation of a claimant's

subjective symptoms, the Social Security Regulations identify seven factors which

may be relevant to the assessment of the severity or limiting effects of a claimant's

impairment based on a claimant's symptoms." *Id*. at 13 (citing 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3)).  "These factors include: activities of daily

living; the location, duration, frequency, and intensity of the claimant's symptoms;

precipitating and aggravating factors; the type, dosage, effectiveness, and side

effects of any medication the claimant takes or has taken to alleviate his or her

symptoms; treatment, other than medication that a claimant has received for relief;

any measures the claimant has used to relieve his or her symptoms; and, any other

factors concerning the claimant's functional limitations and restrictions." *Id*.

    "An ALJ's findings based on the credibility of a claimant are to be accorded

great weight and deference, since an ALJ is charged with the duty of observing a

witness's demeanor and credibility." *Wilson*, 2022 WL 676279, at *16.[10]  But "[a]n

---

[10] Although evaluation of a claimant's alleged symptoms may involve an
evaluation of the claimant's credibility regarding the limiting effects of those
symptoms, SSR 16-3p eliminated the term "credibility" from the Social Security
Administration's policy guidance in order to "clarify that subjective symptom
evaluation is not an examination of the individual's character." SSR 16-3p, 2016
WL 1119029 at *1.

ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason." *Id*.

Applying the above standards to the present record, we conclude that the ALJ's analysis of Little's symptoms is supported by substantial evidence. As detailed above, the ALJ considered Little's statements concerning the intensity, persistence, and limiting effects of her symptoms in light of the medical record, the medical opinions, and Little's daily activities. He amply explained his reasons for finding Little's statements concerning the intensity, persistence, and limiting effects of her symptoms not entirely consistent with the medical evidence and other evidence in the record. In sum, because the ALJ adequately explained his credibility determination, the ALJ's decision in this regard is support by substantial evidence.

Little also points to evidence that she contends supports additional limitations, and she suggests that the court accept her analysis of the evidence over the analysis set forth by the ALJ. But we cannot reweigh the evidence. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356. 359 (3d Cir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (citation omitted)).

And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).  Here, the ALJ fulfilled his duty in evaluating the evidence and explaining why he chose to credit some evidence over other evidence.

In summary, we conclude that the ALJ's decision regarding Little's RFC is supported by substantial evidence.

**B.  The ALJ did not err in his consideration of the opinion evidence.**

Little claims that the ALJ erred by failing to assign proper weight to her treating providers—Physician Assistant Claman and Dr. Medzoyan.  This claim is without merit.

Because Little's claim here concerns the ALJ's handling of opinion evidence, we start with a brief overview of the regulations regarding opinion evidence.  The regulations in this regard are different for claims filed before March 27, 2017, on the one hand, and for claims, like Little's, filed on or after March 27, 2017, on the other hand.  Specifically, the regulations applicable to claims filed on or after March 27, 2017, ("the new regulations") changed the way the Commissioner considers medical opinion evidence and eliminated the provision in

the regulations applicable to claims filed before March 27, 2017, ("the old regulations") that granted special deference to opinions of treating physicians.

The new regulations have been described as a "paradigm shift" in the way medical opinions are evaluated. *Densberger v. Saul*, No. 1:20-CV-772, 2021 WL 1172982, at *7 (M.D. Pa. Mar. 29, 2021).  Under the old regulations, "ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy." *Id*.  But under the new regulations, "[t]he range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis." *Id*.

Under the old regulations, the ALJ assigns the weight he or she gives to a medical opinion. 20 C.F.R. § 404.1527(c).  And if "a treating source's medical opinions on the issue(s) of the nature and severity of [a claimant's] impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Commissioner "will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).  Under the old regulations, where the Commissioner does not give a treating source's medical opinion controlling weight, it analyzes the opinion in accordance with a number of factors: the "[l]ength of the treatment

35

relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the "[s]upportability" of the opinion, the "[c]onsistency" of the opinion with the record as whole, the "[s]pecialization" of the treating source, and any other relevant factors. *Id*. at § 404.1527(c)(2)–(c)(6).

Under the new regulations, however, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).  Rather than assigning weight to medical opinions, the Commissioner will articulate "how persuasive" he or she finds the medical opinions. 20 C.F.R. § 404.1520c(b).  And the Commissioner's consideration of medical opinions is guided by the following factors: supportability; consistency; relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); specialization of the medical source; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(c).  The most important of these factors are the "supportability" of the opinion and the "consistency" of the opinion. 20 C.F.R. § 404.1520c(b)(2).  As to supportability, the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support

36

his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).  And as to consistency, those regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

The ALJ must explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. 20 C.F.R. § 404.1520c(b)(2). Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors. *Id*.  But if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. § 404.1520c(b)(3).

As mentioned earlier, in evaluating the medical opinion evidence of record, "the ALJ is not only entitled but required to choose between" conflicting medical opinions. *Cotter,* 642 F.2d at 705.  Here, that it what the ALJ did.  Relying on the treating-source rule, which, as set forth above, is no longer applicable, Little, however, contends that the ALJ erred by failing to give controlling weight to the opinions of Physician Assistant Claman and Dr. Medzoyan and by instead assigning controlling weight to the opinions of the state agency physicians and

consultant.  But the ALJ did not assign weight to any of the medical opinions.

Rather, in accordance with the new regulations, he addressed the persuasiveness of

each opinion.  And he explained why he found some opinions persuasive or

partially persuasive and others not persuasive.  He also adequately explained how

he considered the supportability and consistency of those opinions.  Thus, we

cannot conclude that the ALJ erred in his treatment of the opinion evidence.

## VI.  Conclusion.

For the foregoing reasons, we affirm the decision of the Commissioner.  An

appropriate order follows.


_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge